THE STATE OF MONTANA, Plaintiff and Respondent, v. WALTER GLOYNE, Defendant and Appellant.

No. 11894.
Submitted Sept. 9, 1970.
Decided Nov. 12, 1970.
476 P.2d 511.

Burns & Solem, Harry Burns (argued), Chinook, for defendant-appellant.

Robert L. Woodahl, Atty. Gen., Patrick J. Brophy, Asst. Atty. Gen. (argued), Helena, Oscar Hendrickson, County Atty., Chinook, for plaintiff-respondent.

MR. JUSTICE JOHN C. HARRISON delivered the opinion of the court.

Appellant, Walter Gloyne, was convicted on four counts of larceny on April 21, 1970, in the district court of the twelfth judicial district, county of Blaine, the Hon. Bernard W. Thomas presiding with a jury. The information, filed on October 28, 1969, charged appellant with five counts of larceny of cattle, on or about September 1, 1969. A motion for arrest of judgment or in the alternative a new trial was denied on May 26, 1970. This appeal followed.

Appellant and his son, John Gloyne, are ranchers in Blaine County. The ranch is located in the vicinity of the Fort Belknap Indian Reservation.. They jointly ran about 250 head of cattle on what is known as the Gloyne Ranch. Approximately 150 head of the herd were owned by John, who had purchased them through a Production Credit Association loan, and another 50 head had been given to him by the appellant. The herd was a mixed herd of Hereford and Angus. It would appear from the record that John owned the Hereford cattle and appellant the Angus cattle. Two brands were owned by the Gloynes. The brand UC was John's and WO was the appellant's. The Gloynes also, for a short time in the fall of 1968, leased a grazing unit from the reservation upon which they ran cattle with one William Snell.

The facts giving rise to this case are as follows: On July 25, 1969, Donald Hughes, an inspector for the Montana Livestock Commission, was traveling in the vicinity of appellant's property in the regular course of his duties when he casually observed some cows branded with X-S on the left hip on appellant's property. Being familiar with the brands of most ranchers in the area, Hughes recognized this to be the brand of William Snell. Upon further investigation Hughes found there were also some cattle in this group with appellant's brand WO. One

calf branded WO was with a cow branded X-S. Hughes contacted William Snell and Bud Campbell, the tribal stock inspector, who came out and helped "mother-up" the cows and calves. Upon completion of this operation they found that of the 9 cows and 8 calves all of the cows had the brand of William Snell, X-S; 3 of the calves were branded WO, appellant's brand; 4 calves were branded UC, John's brand; 1 calf displayed no brand. They contacted appellant and confronted him with the results of their investigation and appellant said "we must have branded them by mistake." Appellant signed a bill of sale for the 7 misbranded calves over to William Snell and the incident was closed.

On August 27, 1969, Donald Hughes was again traveling in the same area when he noticed some cattle on the highway side of the fence. Two of the cows were branded with the Pitsch Brothers Lazy PB. Hughes did nothing at that time but returned the next day with another state brand employee; they went on the appellant's property to have a closer look at the cattle there and observed that several cows branded with the Pitsch Brothers' brand had calves with appellant's WO brand on them. Hughes returned on August 29 with some helpers and they corralled several head of cattle. These cattle and calves, along with several others that were picked up on August 30, were shipped to Havre, where the stock inspectors mothered-up the cows and calves. In all, 15 cows and 10 calves were taken from appellant's property. Of these 10 calves, 7 were branded with appellant's WO brand, 2 were branded with appellant's son's UC brand, and one was without a brand. None of these calves, except the no-brand calf, had mothers with appellant's brand.

On either August 28 or 29, George Pitsch received a telephone call from appellant who told him "I think I have some of your cows over there and I would like to have you come and look at them." This telephone call was after the stock inspectors had rounded up the Pitsch cattle from appellant's property

and after Pitsch had been notified by the authorities that they were holding some of the Pitsch cattle for identification.

In an effort to explain how the Gloyne brands got on calves belonging to others, the record reveals that appellant and his son hosted two branding bees. The first was held on appellant's ranch on or about May 12 for the early calves; present were appellant, his son John, and some 5 or 6 friends, relatives, and neighbors. Appellant's son did not participate in the branding for the reason that he was confined to the house with a broken leg. Appellant testified he did not actively participate in the branding, but prepared the meals and went to the corral only twice to bring water and observe progress. At this branding bee about 150 calves were branded. The branding crews were supposed to place John Gloyne's UC brand on all white face calves and appellant's WO on all black calves. The evidence is in conflict as to whether or not appellant ordered the branding to be done in this manner. However, one of the helpers at the branding testified that appellant told him the Herefords were to get the UC brand and the Angus WO. Further testimony revealed that at this branding bee all the cows and calves were put in a corral, the cows were then taken out and the calves branded. Nowhere does it appear in the record that the calves were mothered-up or that the brands on the cows were inspected to see if all of them belonged to appellant or his son, John Gloyne.

During the last part of June, appellant and his son held the second branding bee in the field. Appellant and his son were present at this second bee, along with several helpers. The 35 or 40 calves branded were born after the first branding bee and again all white faced calves were to be branded UC and black faced calves with WO. Just what part appellant took in this second branding is not clear; but it is clear that it was done for him, at his request, on his property, and under his control and direction.

Appellant presents two basic issues for the consideration of this Court.

(1) The trial court should have granted appellant's motion for arrest of judgment and for a new trial because the verdict is contrary to the weight of the evidence and the law.

(2) The trial court was in error in giving instruction No. 12.

It is well established that this Court will not reverse a jury verdict where there is "substantial evidence" to support the verdict. In a recent case, State v. Doe, 146 Mont. 501, 506, 409 P.2d 439, 442, we held:

"It is not for us, an appellate court, to determine the credibility of the witness or to evaluate his testimony, rather, it is a function for a jury and their decision will not be disturbed by us without a clear showing in the record that either perjury, impeachment or extenuating circumstances were clearly present." See also State v. Lagge, 143 Mont. 289, 388 P.2d 792; State v. Walker, 148 Mont. 216, 419 P.2d 300.

In support of his first contention appellant recites certain facts of the case in an attempt to show that he did not intend to steal the calves, and did not steal them. Appellant contends it was all a big mistake. After Donald Hughes made the initial discovery in July, appellant said "we must have branded them by mistake." With that apology and a bill of sale for the calves involved, all parties thought it might have indeed been a mistake and dismissed the whole matter. However, in August Hughes made a second discovery of misbranded calves on appellant's property. Could this too have been a mistake? Appellant claims that it was. But, in view of the first mistake, why was the appellant negligent in checking to see if there were other calves he may have misbranded? The jury chose not to believe appellant's contentions and the transcript is replete with sufficient facts to sustain its verdict.

Appellant's second issue for review alleges the trial court was in error in giving instruction No. 12. Instruction No. 12 reads as follows

"You are instructed that, the possession, claim of ownership or control over recently stolen livestock shall be deemed prima

facie evidence of guilt of larceny of that livestock unless this presumption is rebutted or contradicted by other credible evidence.''

There was no reversible error in the giving of this instruction. It is the duty of the court to instruct the jury as to the applicable law. Instruction No. 12 was taken verbatim from section 94-2704.1, R.C.M.1947; it is a proper recitation of the applicable law. The calves were in appellant's possession; he claimed ownership over them. What other way is there to claim ownership over cattle? It should be noted that under this instruction the court found appellant did not present sufficient evidence of mistake or any other reason to rebut this statutory presumption.

The state has the burden of proving all elements of the crime and that a defendant is guilty beyond a reasonable doubt, but there is a difference between the burden of proof and the burden of evidence.

Section 94-7203, R.C.M.1947, outlines the duty of the state in a criminal action and is the limit of the state's burden of proof which incidentally, never shifts to the defendant.

''A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal.''

Likewise, in a criminal case the state must go forward with the evidence, but unlike the burden of proof, it may shift frequently. Therefore, in this case, the state had the burden of proving the defendant guilty. As part of its evidence the state used the statutory language in section 94-2704.1, R.C.M.1947. The defendant had the responsibility of rebutting this evidence and the court found that he failed to so do. This principle permeates all criminal cases. See State v. Proctor, 153 Mont. 90, 454 P.2d616; State v. Evans, 60 Mont. 367, 199 P. 440.

The judgment of the trial court is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES CASTLES, HASWELL and DALY, concur.